Thank you. Go ahead. Your Honor, Keith Knowlton representing appellants. I love bringing interesting cases before the court. I think this is one that there's no law that there's a lot that helps us and I'm going to talk about that. But we're talking about in a dependency case, whether the dependency ruling collateral estoppel will apply to a finding of dependency, even though a dependency petition is ultimately dismissed and would bar a case against doctors who reported to CPS under 1336 20 for malice. And that's the case before you. Our position is straightforward. Under the cases I've cited to the court, particularly Yavapai, Maria and Rita, and the more recent case of Benningo, the collateral, I mean collateral estoppel just doesn't apply to those dependency rulings due to the specific nature of what is going on in a juvenile court. What's going on in a juvenile court is that everything we call it, when in doubt, the juvenile wins, the court wins. What's in the best interest of the child governs and the safety of the child governs. So if there's any doubt, the judge will always err on protecting the child. That dependency changes. Every time it comes up under Arizona rules, you can appeal the court's determination of dependency. So if we have an initial dependency, we have a dependency, we have a subsequent ruling, you can appeal that. Judge Martone said, look, because you can appeal a dependency ruling because a constitutional right is being protected out of juvenile court. It's a final order. Collateral estoppel applies to it. But if you look at Benningo, you look at Yavapai, you look at Maria and Rita, those cases are clear that for a normal civil jurisprudence, for collateral estoppel to apply, you have to have a final ruling that ends it. And those cases are clear that a dependency ruling is not a final ruling. It is subject to subsequent review by the court. So our argument is, and we're asking the court to reverse the key to his ruling on the summary judgment, which we thought was the base for his ruling, that we are barred from saying that the doctor said anything wrong or inappropriate or acted with malice simply because the court found dependency. Well, I guess my worry with this is that it seemed to me like you did have a fair opportunity to develop and present facts and legal arguments on these issues. Correct, Your Honor. I mean, it seemed to me that you had over two years to develop the facts. As we go through this and we look at what happened, you knew what the issues were. You knew that he'd even told you, you've got to get out there and do something about these particular issues. And then to suggest that what he did here, based on issues he told you to go out and do something about, seems, I guess I don't know why you didn't have a fair opportunity to do whatever you had to do there. Your Honor, I don't think a fair opportunity is what I am thinking is the issue, but let me explain. When that case was brought, we did the notice of claim. Under Arizona law, you do a notice of claim within 180 days and you file a lawsuit on state torts within one year. We had to do that. The juvenile court case is ongoing. I am not in a counsel of record in the juvenile court case at that time. So I can't get the records. I can't get anything. Yet I am forced as a plaintiff's lawyer to put the case on the table. Not artfully done, not well done. And we put that case on the table. As this case, they remove it. We get to the point we serve it. They remove it to federal court. I am still not involved in the juvenile court case. As you look at their list of all the rulings that occurred in the juvenile court case, prior to our filing our complaint on March 22nd, there's only two or three. The rest of those rulings all take place after we have filed our complaint in the federal district court case. So now we're involved. What do we do? We're having scheduling orders with Judge Campbell, and he is directing me to go and to get an order from the juvenile court to get the records. So that I could get the records, I had to file a motion to appear as co-counsel for my client's juvenile court lawyer who was state appointed. That's how I began to get the records so I could go forward. Defense, Brett Johnson, actually wanted to file a motion to stay the whole thing until the juvenile court ruled. So we're in a position of we're going to have to wait until the juvenile court rules on severance before we can go forward with the case. All the lawyers in the room or representatives for their clients attended that juvenile court trial. I came in as co-counsel for my client in the juvenile court trial. Prior to that trial, I filed a motion with the court to get the records. When we're at trial and the court allows me to appear as counsel, which I had to get approval to do, she denied that motion because the state of Arizona, through its attorney general's office, opposed the motion. When I had met with the state's counsel about doing this motion, they said, no, not a problem. They would support it. But the attorney general in the juvenile court opposed it. The judge says, no, I'm not going to deal with it. We did the juvenile court trial. You said that the defendants moved to stay this proceeding until the juvenile proceeding was over. What was your position with respect to that? I don't think we needed a stay order, but we definitely needed to get the records from the juvenile court, and we needed to complete the severance. So your position was don't stay? Yes, Your Honor. And the court didn't. In hindsight, stupid decision. But the issue at that point in time, it was clear in front of the court that we're waiting to get records from the juvenile court and that we can't go forward until we get those records. I think everybody knew that, and Judge Campbell had directed that we go forward. When we got done with the trial, Judge Campbell directed me, file it by October 30th, refile it. I'd already talked to the judge at the end of trial, and she said, okay, we're doing our briefing. Get it in to me after the briefing. So I file it. Again, the attorney general in the juvenile court opposes it. He doesn't like my order. I immediately say, whatever order you want, just give it to me. The juvenile court judge sat on that until after she ruled in January of 2012. I would have liked that to have gone quicker. I believe I was as frustrated as the judge was on that. But that's that issue. Well, my worry is that it seemed to me that your first idea was, well, you didn't give me notice about what you're really giving me on summary judgment. Well, my general rule is if you don't give them notice, they ought to have a chance to be there. But every time I'd go through this record, it didn't seem to me you didn't have notice. It seems to me you're well in line with where a summary judgment could come, and it came down, and now we've got the summary judgment in front of me, and I don't think fair notice is a very good – well, I'm trying to be as best advocate for that position as I can, but I'm having a tough time about that fair notice. I mean, to me, it seems to me that you had fair notice, and that can't be an issue. Your Honor, let me explain a little differently. In the old days, not too long ago old days, when somebody filed a motion for summary judgment and they said collateral estoppel, we're raising a legal issue, you lose, I had to respond with my entire case, everything, all the affidavits, you name it, I had to file it because why? The judge can look at the entire case, even though it's not focused in the pleadings. Rule 56F was to end that game. It was to end that game. Rule 56F says that if you're going to go outside the scope of the pleadings, that's the notice you give. It isn't that we had a fair opportunity. Discovery, in that case, we just hadn't done depositions at that point in time. They were filing a motion for summary judgment on a legal issue. We didn't need to complete depositions for that legal issue, which we presented to you. Now I better understand what you just were telling me. You went a long ways around. I didn't know whether you really caught the issue because that is important to me, but I was having a tough time. It doesn't seem to me that this judge didn't tell you all the way along what he was thinking about. Well, and can I flip that on you, Your Honor? Sure, you can flip it on me. When I saw his motion for summary judgment to cover my bases, I attached the affidavit of Dr. Neuberger. Dr. Neuberger did testify in the juvenile court. He investigated all the Munchausen syndrome by proxy allegations. He interviewed the young lady. Very thorough report. One of the top child abuse, pediatric child abuse experts in this country who has experience with Munchausen syndrome by proxy. He went through the records that the doctors used as the basis for making their report, okay? And he says they misrepresented this, they misrepresented that, and he gets to the point of saying it's to the point where you have to question their honesty of what they're doing. We did that so the court would see, and I want you to understand, we first submitted that on a motion to dismiss to Judge Campbell so that he would know we had a factual basis for what we're trying to do here. And then that was already a record in this case, so I put it in there for Judge Martone so that he would understand we had a factual basis. He never considered, if you read that ruling in his order, he never considered Neuberger's report, the facts that he discussed, when he was making his decision on malice and reasonableness. And I want to clarify something there. I don't know if the court's aware of this. Their initial report had to be reasonable to make them a mandatory reporter. The doctors at Banner did something more. The Attorney General's office, the investigator, Laura Peterson, didn't investigate. She turned everything over to them. And she had the same doctors who investigated the matter make a recommendation as to whether this child should go into CPS care and custody. Argument, that's incompetent. You don't have the same people who are complaining, do an investigation and evaluate the medical records and not do your own investigation. And as a matter of fact, in the record, in October of 2008, when they had their first family meeting, the child's taken September 3rd. By October, they have a parent meeting. And it was specifically put in that record, that they needed to investigate the allegations made by the doctors, and they needed to make sure that the expert was independent. But they didn't do that on the independent. Your Honor, our case is really straightforward. The court was wrong on applying collateral estoppel to those juvenile court rulings. It's such a unique. The Benninger case makes a Benegal case in the case of. Supposing I go along with you. Okay. That you can't be collateral estoppel for juvenile court decisions. Don't the juvenile court's repeated decisions to deny Smith custody of CR support the defendant's argument that their reporting of child abuse was reasonable and not malicious? As long as collateral estoppel doesn't apply to us, we can deal with those factual issues. I think you can look at the factual basis for the juvenile court's ruling, and that could be applied against us to make it reasonable. But you can't say. My worry is then the district court has adequate grounds for granting the defendant's motion for summary judgment. You have no adequate grounds on reasonableness to grant a motion for summary judgment. That's not the standard. Reasonableness only makes you a mandatory reporter. For a mandatory reporter or anybody else, you have immunity, 133620J, so long as you did not act with malice. So if they are a mandatory reporter, now we get to the issue of malice. That's a factual issue. There were sufficient facts that they acted to vex, harm, and injure my client. Are you going to talk about sanctions at all? I was going to rest on the briefs on that unless you had some questions on that. I talked about it a little bit. I think I misread the question and went the wrong direction on that. I'll rest and reserve the rest of my time. Well, as long as you're on malice, what facts do you present to show the reports were malice? Let me start with the— I mean, I read through this. It seems to me that the best you say is that the doctors made decisions that your client didn't like. I'm looking for malice here. Okay. I appreciate she didn't like them. It has nothing to do with that other than if you threaten a doctor with malpractice and you end up with confrontations with doctors, that's an issue that goes into the malice determination. It doesn't necessarily, in and of itself, prove malice. You have a dependency petition with significant and serious false allegations that were put in there by those same doctors. One came from Amir Banner, who was a social worker who worked for Dr. Oppenheim and Elton, and the other one came from Dr. White, who was the head of the pediatrics unit at St. Joseph's Hospital. They made these representations to—what is her name? Having a senior moment. But the investigator for CPS— I just want to make sure that you know where I am. The reason that I worry about this is Ramsey says, and I quote, the court presumes that a person acting pursuant to 133620 acted in good faith and with proper motives. And then I read what it is that's in this record, and I'm trying to still understand what facts say malice with a presumption against it. Let me hit the direct point. Let's forget about the 133620 for just a second. I'm going to come back to it, which means the mandatory reporting part of it. That's the initial report. We're talking about the subsequent recommendation. Was that with malice? We have Dr. Elton's testimony that they entered into that. My client's daughter had a condition. They thought, geez, there's no explanation for this medically. It must be psychological. But then he diagnoses high brain pressures. Then he puts a shunt in her head. Then he says to Detective Page, well, that resolves the medical conditions we have, but we have concerns about these coma incidents that occurred in the past, which is raw speculation at best. There's absolutely no evidence of that. For the doctors who made the initial report to CPS to then recommend to CPS that that child be taken into custody because of these unexplained coma incidents that occurred while the child was in doctor's care, some most of the time going through procedures, and none of those doctors say that. There's no medical record to support it. That's to vex harm and injure, and I think a jury can look at that. Now, look, we start there. Now we go backwards. Then you look at Neuberger's report and the serial misrepresentations contained therein. The evidence starts piling up. Then you look at the dependency petition and the falsity in it by those same people. You don't misrepresent a DNR and a hospice three weeks prior to the child being taken into custody. You just don't do that. You don't misrepresent that she only wants narcotics given to this child and she won't give other treatments. There's not one record to support that. It's not true. And if you had just, as Dr. Neuberger says, if you had just looked behind it, just looked at it, you will see that what they said was not true. A jury can make that determination. Your time is done. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Brett Johnson on behalf of Banner Health and Dr. Scott Elton with me today is Sarah Ogney. Appellant's counsel's argument is simply a revisionist history of what occurred in the proceedings below. The simple fact is that over several years of litigation in two judicial fora, appellant was not able to develop a scintilla of evidence to support conspiracy theories. Appellant did have a full opportunity to present her case before the juvenile court, Judge Campbell, Judge Martone. Appellant did have notice of all the arguments that Judge Martone ruled on in his motion for summary judgment. We raised collateral estoppel on several occasions in our motions to dismiss. Judge Campbell, in his motion to deny our second motion to dismiss, said that, yes, they had properly stated a claim, but then, as Your Honor has already pointed out, gave clear direction to appellant as to develop the facts associated with that. Allowing appellant any relief on the record presented would have a significant chilling effect on practitioners who need to immediately report a reasonable belief of possible child abuse or neglect. Furthermore, due to the conduct of appellant and her counsel during the lower court proceedings, the district court granted appropriate sanctions for discovery abuses and unnecessarily prolonging these proceedings. One issue brought up... You raised these issues in your motion to dismiss? Yes, Your Honor. We raised all of these issues in our motion to dismiss, including ARS 133620, the immunity associated with it. Ramsey came out around the same time as our second amended complaint. Our motion to dismiss there raised Ramsey in that case. And then, of course, once Judge Campbell allowed these cases to proceed, discovery finally occurred. The juvenile court finally released the records. The records were finally released to us, and over seven different orders was abuse found and the necessary for the welfare of this child to keep in the state's custody. On that basis alone, Your Honors, this case should not be here. The practitioner should not have had this period of time of the uncertainty for doing the right thing and reporting suspected child abuse. There are seven different factors that go to the reasonable belief, Your Honor. It's not reasonableness of the report that appellant keeps on wanting to try to present to this court. It is reasonable belief. And in this case, we have seven different factors for reasonable belief as to the report. In regard to the September 3rd meeting with CPS, counsel is wrong. There is still immunity for participating in the investigation of CPS, and there's no reasonableness standard associated with that. It is just cooperation with law enforcement for the welfare of the child. In this circumstances, the standards were met, reasonable belief existed, and we can look to Ludwig and Ramsey for those propositions. What's your response on the malice observations by your colleague here on why there was sufficient evidence in the record to support a finding of malice, at least for dispositive motion purposes? Yes, Your Honor. For purposes of summary judgment, obviously if there is no genuine issue of fact, we have summary judgment, which is what Judge Martone did in this case. Unlike what counsel has presented to this court, Judge Martone did read Dr. Neuberger's report on several occasions. One of them was for our motion to strike because it didn't comply with Rule 26. Then it's incorporated into the motion for summary judgment. The one paragraph that dealt with Dr. Elton in that, based off of my review of the records, there was bad faith, et cetera. But what Judge Martone said is you have not presented any facts to substantiate whether or not Dr. Elton or Banner Health practitioners had malice. And that, since there is no genuine issue as to fact, we no longer have a case here. So the fact is that Dr. Neuberger is not needed under Rule 702, which is what Judge Martone said, to determine the state of mind of the practitioners. And then I think that the court needs to go back to the August 27th report, look at the seven different factors, compare that to Ludwig and Ramsey, where all it was was a statement to the practitioner that abuse had occurred. Forget about the evaluation and the other factors that occurred during that period of time by Dr. Elton and Banner Health. All they needed was one of those factors to have a reasonable belief, which is a subjective issue, to be able to report. From that, Your Honor, there's no other questions in regard to merits. We'll move on to sanctions. And I know that counsel wants to rely on his briefs in that factor. Let's do one more question on merits. Yes, Your Honor. Because he suggests that as to collateral estoppel, the only real decision you have is the juvenile decision, and the juvenile decision is not sufficient to make that determination. What do you respond? Your Honor, with all due respect to appellant's counsel, he's misread those cases. If you look at Rita, if you look at Mara, if you look at the other cases that are cited, you look at the substance of the order, not the final title of the order, to determine whether or not there's finality that collateral estoppel would attach. And in this case, when you look at the proceedings of both Rita and Mara, what it says is that for purposes of dependency, that is now a final order that could be appealed. And guess what? Appellant appealed it. The court of appeals then dismissed it because she failed to prosecute the appeal for the April 7th initial dependency order. She knew she had the right to go get an appeal and that the order was final. When she didn't pursue that, why? Because she knew she had an evidentiary hearing coming up before Judge Bergen at that time, I believe. And she rolled the dice, as counsel likes to say on the appellant's side, she rolled the dice on the evidentiary hearing and she lost. And during Judge Bergen's order, what did she rely on? She went back to the August 27th determination as to what the doctor's factors were because that is what was presented to her in the dependency petition. So the argument suggesting that those dependency orders weren't final because a couple of months later the court went back to evaluate the same issues is not a good argument? I mean, it doesn't seem to me that they were final. If you can evaluate them every, well, two months later they were evaluated. But you're evaluating, and I will defer to the state on juvenile court proceedings. I'm definitely not a juvenile court hearing. All I'm trying to do is I heard his argument. Understood, Your Honor. I'm trying to give effect, as I understood, to what's in his brief and his argument. Yes, Your Honor. And if you look at the juvenile court rulings, yes, each order is looking at the case in totality. But for the dependency hearings orders, what the court is looking for is what happened during this period of time and whether, actually, did appellant go get that psychiatric treatment that she needed to be able to get her child back and continue on with reunification. That is what is being issued. And each time the court found a continued rationale that for the best interests of the children, as well as to avoid abuse or neglect, that dependency was necessary. And we have seven different orders. So what it was before Judge Burgett was that dependency? That was dependency, Your Honor. And then Mahoney also had – Judge Mahoney also had dependency. And then she eventually had severance, Your Honor. So you can take one of those orders, September, April, June, all the way through two years of proceedings, evidentiary hearing after evidentiary hearing, where the appellant had every opportunity to develop her conspiracy theories in regard to the case. Judge Burgen heard them. Judge Mahoney heard them. We should not have our district court sitting and second-guessing our juvenile court judges. The juvenile court judges are in the best position to determine the welfare of the children. Going around that – oh, yes, Your Honor. Is the juvenile court proceeding a determination as of that particular time? Is that – That's correct, Your Honor, as to that particular time. But in all fairness, they are looking at the totality of the circumstances. So, for example, let's bring up the comas that is brought up in both Judge Burgen's later hearings.  She had an opportunity to present evidence that those comas were or were not good. So, from that perspective, we have finality here. She knew her rights. She could appeal. Going to a district court judge rather than the Arizona Court of Appeals is an inappropriate activity. On to sanctions, if I may, Your Honor, just real briefly. The only reason I want it is because I'm trying to make sure you have a chance to respond to the arguments counsel made. No, absolutely, Your Honor, and I think that actually flows in nicely to the argument because one of the arguments that Capellent does raise for the first time on appeal is a right to a hearing on sanctions. And in this circumstances, we have two cases of the Ninth Circuit, Portsmouth and Cowden, that basically says you have the opportunity to request a hearing, but you don't have a right to a hearing. Judge Campbell cited partridge. Judge Martone also cited partridge for the proposition that under the local rule, if oral argument is not necessary, it's not necessary for this situation. If he believed that he was entitled to a hearing, I believe in regard to the 1927 argument, that's the argument there. Only time he asked for a hearing, he doesn't ask for one for Rule 37 or for 1988. But in regard to the 1927 hearing, Judge Martone wasn't asked for a hearing. And then the other, the secondary issue on that, Your Honors, is what facts would have been presented at a hearing, what evidence, what witnesses would have been called. We don't have any of that before us as to whether a hearing was necessary. And for judicial economy, on this record, we didn't need a hearing. Yes, Your Honor. No, no. You answered my question. Okay. Yes. If that is all, Your Honor, I will give the State an opportunity to respond. All right. Thank you, Your Honor. If it pleases the Court, James Bowen for the State Defendants. I will stand on my briefs because Plaintiff did not, to my knowledge, argue anything about the State, other than Judge Martone did not reach the collateral stop. We argued it applied, but he says, no, I can reach the head of immunity, the State, our CPS defendants had immunity. Just a couple of things. Plaintiff's counsel, in his earlier statement, talked about the major investigator, Pettersen, and said, he seems to acknowledge that Dr. White told her that, in fact, this lady was seeking drugs or narcotic treatments for her daughter and wouldn't take other forms of treatment. That she had a monitor in there for cerebrospinal pressures that was in there for three days when it shouldn't have been in there at all. And then the third one was the social worker, from Banner, saying that she was asked for a DNR and a hospice referral a week before she was being discharged from the hospital. They don't deny. That's what those people, those witnesses told us.  This is a social worker at a hospital. We have a right to rely on those opinions. Now, whether they're false or not, in deposition, Dr. White had told us the monitor was in for three days. Well, in fact, if you count up the hours, hour by hour, it's something like 49 or 50 hours, which is a little more like two days, between the period of the 19th and the 21st. The response to that is quite clear. Okay, well, maybe Dr. White was wrong. She left this needlessly for two days instead of three days. I don't think that's a relevant fact. Second thing, by the way, as counsel just pointed out, she's had opportunities every time the court reviewed this dependency, and during the trial, to say, hey, you've made a mistake here. It's really two days that we did this, not three days. As far as the drug-seeking, the Dr. White report, again, there's no question he reported it to our investigator. Then he goes and says, well, we went through hundreds and even thousands of pages of medical records, and guess what? We found a record where Dr. Isla said, oh, well, I'm trying to wean her off, and Mother's going along with me. I'm going to try to wean her off of the methadone I had to put her on because I'd had her on oxycontin at such high doses that I was concerned. She says, so that's proof that Dr. White lied. She's seeking other alternatives. That doesn't change the fact. That's what Dr. White told her, and that's what he observed when she was at St. Joseph's Hospital. Isla's a private pediatrician. The third one was the social worker, when, again, no question, or at least there's no question that she reported to CPS about a week before she was being discharged that Mom had asked for this hospice referral. She said, I don't recall if I mentioned anything about a DNR. The reality is you go to hospice, those are for patients who are going to die. Typically, there isn't a DNR. There would be a DNR, but be that as it may, there's no question she reported that. Plaintiff goes, well, when we looked through all of Banner Hospital's records, there's no reference whatsoever to her asking for this. That doesn't tell us anything. They may not have put in a record. The fact is, is when she supposedly or allegedly asked for this from the Banner doctors, they said, well, why would we do that? This isn't a terminal patient. We only send terminal patients to hospice. They may or may not have put a note on there. But that doesn't make this some kind of a fabricated affidavit or that kind of thing. Again, Judge Martone, what he was looking at, and what he decided this case on, is there was qualified immunity, a reasonable caseworker, presented with the facts from the information from at least six different doctors from two independent hospitals, reviewed by a doctor, which, by the way, one of our initial accusers was Banner. He goes, well, Dr. Kaufman, she works for these guys. She has no affiliation whatsoever with Banner Hospital. These are the four doctors that said, we can't, in good conscience, send this girl home with her mother because, and there was four doctors, including a pediatric psychiatrist, that said to send this girl home with her mother would further endanger her mentally and psychological health. Weren't you right in the first place that this wasn't argued by the? Right. Other than that, and I've got 11 seconds. Any questions I can answer? No. I think we've taken up the questions we truly had, and I understand your argument, and I expected, based on your briefs, that's exactly what you'd say. I'll give you 30 seconds. Your Honor, it hit a couple points. I couldn't go into everything, so I'm resting on my brief as well as to the standards. I understand. I understand you have to rest on your brief. I'm only giving you so much time, but I give you 30 seconds to hit the high point. Your Honor, let's talk about the chilling effect. This case only has a chilling effect. If a doctor acts with malice. We're only trying to enforce a statute. If the doctor acts with malice, he loses his immunity. There's a lot of protections in there. The sanctions order has the exact opposite. It was intended to not only stop this appeal, but to stop anybody from dare questioning a doctor. In light of Judge Newberg, I mean Dr. Newberger's report, tell me a case where you can prove malice then. If you don't have a, this requires medical testimony. I have a top medical doctor who's reviewed the record and says they misrepresented. If I can't get that to overcome the presumption and get to a jury, then it is impossible to do so. Thank you. Thank you, Your Honor. 30 seconds and it's done. Appreciate counsel. Appreciate your argument. Tough cases. And we will submit now case 1315413 and 1316422, Smith v. Banner Health System.
judges: Gleason, Schroeder, Smith